No. 24-1716

In The
United States Court of Appeals
for the Third Circuit

Representatives Dawn Keefer, Timothy Bonner, Barry Jozwiak, Barbara Gleim,
Joseph Hamm, Wendy Fink, Robert Kauffman, Stephanie Borowicz, Donald (Bud)
Cook, Paul (Mike) Jones, Joseph D'orsie, Charity Krupa, Leslie Rossi, David
Zimmerman, Robert Leadbeter, Daniel Moul, Thomas Jones, David Maloney,
Timothy Twardzik, David Rowe, Joanne Stehr, Aaron Bernstine, Kathy Rapp, Jill
Cooper, Marla Brown, Mark Gillen And Senator Cris Dush—All Pennsylvania
Legislators,

Plaintiffs–Appellants,

v.

Joseph R. Biden, In His Official Capacity As The President Of The United States, Or
His Successor; United States; U.S. Department Of Agriculture; Tom Vilsack, In His
Official Capacity As Secretary Of Agriculture; U.S. Department Of Health And
Human Services; Xavier Becerra, In His Official Capacity As Secretary Of Health And
Human Services; U.S. Department Of State; Antony Blinken, In His Official Capacity
As Secretary Of State; U.S. Department Of Housing And Urban Development;
Marcia Fudge, In Her Official Capacity As Secretary Of Housing And Urban
Development; U.S. Department Of Energy; Jennifer Granholm, In Her Official
Capacity As Secretary Of Energy; U.S. Department Of Education; Dr. Miguel
Cardona, In His Official Capacity As Secretary Of Education; Josh Shapiro, In His
Official Capacity As Governor Of Pennsylvania, Or His Successor; Al Schmidt, In
His Official Capacity As Secretary Of The Commonwealth, Or His Successor;
Jonathan Marks, In His Official Capacity As The Deputy Secretary For Elections And
Commissions, Or His Successor,

Defendants–Appellees.

On appeal from the United States District Court for the Middle District of
Pennsylvania, docket no. 1:24-CV-00147

**Brief of Plaintiffs-Appellants**

Erick G. Kaardal, WI 1035141
Elizabeth A. Nielsen, PA 335131
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: (612) 341-1074
Email: kaardal@mklaw.com
Email: nielsen@mklaw.com

Karen T. DiSalvo, PA 80309
Mohrman, Kaardal & Erickson, PA
Election Research Institute
1451 Quentin Rd Ste 232
Lebanon, PA  17042
Email: kd@election-institute.com
*Attorneys for Appellants*

Jeffrey E. Sandberg
Daniel Tenny
U.S. Department of Justice, Civil
Division, Appellate Staff
950 Pennsylvania Avenue NW
Room 7214/7215
Washington, DC 20530
Telephone: 202-532-4453
Telephone: 202-514-1838
Email:jeffrey.e.sandberg@usdoj.gov
Email: daniel.tenny@usdoj.gov
*Attorneys for Federal Appellees*

Jacob B. Boyer
Governor's Office of General Counsel
333 Market Street, 17th Floor
Harrisburg, PA 17101
Telephone: (717) 460-6786
Email: acobboyer@pa.gov
*Attorneys for Pennsylvania State Appellees*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ............................................................................ iv

SUMMARY OF THE CASE ............................................................................ 1

STATEMENT OF JURISDICTION ............................................................ 1

STATEMENT OF THE ISSUES ..................................................................... 2

STATEMENT OF RELATED CASES AND PROCEEDINGS ............... 3

STATEMENT OF THE CASE .......................................................................... 4

I.   Legislator-appellants have the individual opportunity and responsibility to vote to regulate the manner of federal elections in Pennsylvania. ........................................................................................ 4

II.  Pennsylvania legislators successfully voted for legislation prohibiting third-party involvement in elections. ................................ 5

    A. Biden's Executive Order 14019 solicits nongovernmental third-party involvement in the manner of elections—that is, the registration process. ................................................................... 6

    B. State Secretaries of State, Attorneys General, and members of Congress asked Biden to rescind EO 14019 and explain its implementation. .............................................................................. 8

III. Pennsylvania Governor Shapiro changed the manner of federal elections by unilaterally proclaiming automatic voter registration that is contrary to the state's election law. ........................................ 11

IV.  Pennsylvania executive officials changed the manner of federal elections through directives that contradict legislation. ................... 12

SUMMARY OF THE ARGUMENT ............................................................. 15

ARGUMENT ....................................................................................................... 18

Standard of Review............................................................. 18

I. Legislators have the exclusive authority to enact legislation
regarding times, places, and manner of federal elections........................ 18

A. Pennsylvania Governor Shapiro cannot "amend" state laws
governing federal elections enacted by the legislature....................... 18

B. Pennsylvania Department of State executive officials cannot
promulgate directives that "amend" state laws governing federal
elections enacted by the legislature. ..................................... 23

C. President Biden cannot "amend" state election laws governing
federal elections........................................................ 26

II. Individual legislators have cognizable individual injuries when the
executive branch unconstitutionally exceeds its authority that is
contrary to legislator votes affecting state federal election laws. ........... 29

A. *Coleman v. Miller* provides the applicable "vote nullification"
precedent test for finding the individual Legislator-Appellants
have standing. ......................................................... 31

1. The district court's reliance on *Raines v. Byrd* is misplaced
because the asserted injury was not inflicted by the state
legislature itself, but by the actions of the executive branch of
government. ...................................................... 36

2. *Coleman* remains the law of the land even with regard to
recent Supreme Court decisions such as *Virginia House of
Delegates*. ...................................................... 40

B. The district court's narrowed construction of the phrase
"sufficient to defeat or enact" referenced in *Coleman* to only final
legislative votes is misplaced............................................ 41

C. The Elections Clause or the Electors Clause create § 1983-
enforceable individual rights for Legislator-Appellants. .................... 44

1. Legislator-Appellants suffer individual injuries because under
provisions of the U.S. Constitution, § 1983-enforceable rights
are for the individuals, even when groups are named. ............... 48

D. Legislator-Appellants suffered an injury different than other members of the Pennsylvania General Assembly. ............................................. 50

III. It is prudential to acknowledge Legislator-Appellants' standing to protect separation and balance of powers. .............................................. 51

CONCLUSION ...................................................................................... 54

CERTIFICATE OF COMPLIANCE .......................................................... 56

USE OF AI TECHNOLOGY CERTIFICATION ......................................... 57

# TABLE OF CITATIONS

Page(s)

## Cases

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ...................................................................... 29, 35

*Am. Legion v. Am. Humanist Ass'n,*
588 U.S. 29 (2019) ............................................................................. 47

*Americold Realty Tr. v. Conagra Foods, Inc.,*
577 U.S. 378 (2016) ........................................................................... 46

*Arizona State Legislature v. Arizona Independent Redistricting Comm.,*
576 U.S. 787 (2015) ................................................................ 31, 40, 41

*Blessing v. Freestone,*
520 U.S. 329 (1997) ........................................................................... 44

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) ........................................................................... 48

*Chiafalo v. Washington,*
591 U.S. 578 (2020) ........................................................................... 47

*Citizens United v. Fed. Election Comm'n,*
558 U.S. 310 (2010) ........................................................................... 49

*City of Racho Palos Verdes v. Abrams,*
544 U.S. 113 (2005) ...................................................................... 44, 45

*Coleman v. Miller,*
307 U.S. 433 (1939) ................................................................... passim

*Colon-Marrero v. Velez,*
813 F.3d 1 (1st Cir. 2016) ............................................................ 44, 45

*Com. v. Gouger,*
21 Pa. Super. 217 (Pa. Super. 1902) ................................................. 21

iv

*D.C. v. Heller,*
554 U.S. 570 (2008) ................................................................ 48

*Dennis v. Luis,*
741 F.2d 628 (3d Cir. 1984) ................................ 1, 33, 34, 36

*Dodak v. State Admin. Bd.,*
495 N.W.2d 539 (Mich. 1993) .......................................... 33

*Ex Parte Young,*
209 U.S. 123 (1908) ............................................................ 29

*Fumo v. City of Philadelphia,*
972 A.2d 487 (Pa. 2009) .................................................... 35

*Gonzaga Univ. v. Doe,*
536 U.S. 273 (2002) ............................................................ 45

*Goode v. City of Philadelphia,*
539 F.3d 311 (3d Cir. 2008) .............................................. 34

*In re Est. of Kerstetter,*
808 A.2d 344 (Pa. Cmmw. 2002) ..................................... 21

*In re Horizon Healthcare Services, Inc. Data Breach Litigation,*
846 F.3d 625 (3rd Cir. 2017) ............................................. 18

*Keefer v. Biden,*
No. 1:24-CV-00147, 2024 WL 1285538 (M.D. Pa. Mar. 26, 2024) ........................ 2, 3

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ............................................................ 30

*Markham v. Wolf,*
647 Pa. 642, 190 A.3d 1175 (2018) ................................... 20

*McPherson v. Blacker,*
146 U.S. 1 (1892) ............................................................... 46

*Moore v. Harper,*
600 U.S. 1 (2023) ............................................. 17, 47, 51, 52

*Raines v. Byrd,*
521 U.S 811 (1997) ..................................................................passim

*Republican Party of Pennsylvania,*
141 S.Ct. 732 (2021) ............................................................... 53

*Russell v. DeJongh, Jr.,*
491 F.3d 130 (3d Cir. 2007) .................................................. 35

*Shapp v. Butera,*
22 Pa.Cmmw. 229, 348 A.2d 910 (1975) ............................. 20

*Silver v. Pataki,*
755 N.E.2d 842 (NY. Ct. App. 2001) ...............................33, 42, 54

*Smiley v. Holm,*
285 U.S. 355 (1932) ...........................................................21, 22, 52

*Storer v. Brown,*
415 U.S. 724 (1974) ............................................................... 22

*Trump v. Hawaii,*
138 S.Ct. 2392 (2018) ............................................................ 29

*Virginia House of Delegates v. Bethune-Hill,*
587 U.S. 658 (2019) .................................................. 31, 32, 40, 41

*Yaw v. Delaware River Basin Commission,*
49 F.4th 302 (3rd Cir. 2022) ............................................17, 36, 38

*Youngstown Sheet & Tube Co. v. Sawyer,*
343 U.S. 579 (1952) ............................................................... 27

## Statutes and Legislation

Executive Order 14019 ..............................................................passim

5 U.S.C. § 701.......................................................................... 2

5 U.S.C. § 706.......................................................................... 30

28 U.S.C. § 1291 ...................................................................... 2

28 U.S.C. § 1331 .................................................................. 2

28 U.S.C. § 1343(a)(3) ........................................................ 2

28 U.S.C. § 1346(a)(2) ........................................................ 2

42 U.S.C. § 1983 ........................................................2, 44, 47

52 U.S.C. § 20901 .............................................................. 6

52 U.S.C. § 21083 ...................................................12, 16, 25

25 Pa.C.S. § 1803(a) .......................................................... 23

25 Pa.C.S.A. § 1321 ....................................................passim

25 Pa.C.S.A. § 1328(a)....................................... 12, 16, 24, 25, 26

25 Pa.C.S.A. § 1328(b) ...................................... 12, 16, 24, 25, 26

25 P.S. § 2607 ...........................................................passim

35 Pa.C.S. § 7301(b) ......................................................... 20

Pa. Const. art. II, § 2 ........................................................ 46

Pa. Const. art. III, § 4........................................................ 4

Pa. Const. art. III, A, 1 ...................................................... 19

Pa. Const. art. IV, § 2 ....................................................... 19

Pa. Const. art. VII, sec. 1 ................................................... 52

Senate Bill 40........................................... 11, 17, 18, 23

Senate Bill 982 ........................................................... 5, 28

U.S. Const. art. I .......................................................passim

U.S. Const. art. II........................................................passim

U.S. Const. art. III .................................................1, 2, 29, 43

U.S. Const. art. V ............................................................17, 31, 32

**Rules**

F.R.C.P. 12(b)(1) .......................................................... 2, 18

F.R.C.P. 12(b)(6) ............................................................ 18

**Other Authorities**

16 C.J.S. Constitutional Law § 456 ................................... 19

## SUMMARY OF THE CASE

Twenty-seven Pennsylvania Legislators seek reversal of a lower court decision granting a motion to dismiss their complaint alleging executive branch official actions have usurped individual legislator rights and duties to regulate time, place, and manner of federal elections. The dismissed allegations revealed how executive actions unilaterally contradicted state election laws, including individual legislator acts specifically rejecting the undertakings of executive officials. As in *Coleman v. Miller,* 307 U.S. 433 (1939) and *Dennis v. Luis,* 741 F.2d 628 (3d Cir. 1984), the executive undertakings nullified the legislators' votes that were sufficient to enact and defeat specific state legislation regulating the manner of federal elections. Under these circumstances, contrary to the district court's ruling, the Legislator-Appellants do have standing for declaratory and injunctive relief.

## STATEMENT OF JURISDICTION

Plaintiff-Appellant Legislators challenged Executive Order 14019 issued by President Biden, an announcement by Governor Shapiro, and a "directive" issued by Pennsylvania Department of State executive officials, all regarding aspects of voter registration. App.31-69 (Amended Complaint); App.70-263 (Complaint Exhibits). The Legislator-Appellants brought claims under the Electors and Elections Clauses of the United States Constitution art. II, § 1, cl. 2 and art. I, § 4, cl. 1, respectively seeking equitable relief. The U.S. District Court for the Middle District of Pennsylvania had jurisdiction over this action pursuant to Article III of the United States Constitution,

5 U.S.C. § 701, et seq. (the Administrative Procedures Act), 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), 28 U.S.C. § 1346(a)(2), and 42 U.S.C. § 1983. The District Court dismissed the Amended Complaint under F.R.C.P. 12(b)(1) of the Federal Rules of Civil Procedure, ruling that the Legislator-Appellants lack Article III standing. App.3; 29-30. The Court did not address the merits of the remaining legal claims.

The District Court entered final judgment on March 26, 2024. The decision in *Keefer v. Biden*, No. 1:24-CV-00147, 2024 WL 1285538 (M.D. Pa. Mar. 26, 2024), is reproduced at App.3 (Order) and App.4-30 (Memorandum). The Notice of Appeal was timely filed on April 18, 2024, reproduced at App.1-2. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 as this is an appeal from a final decision of a district court.

## STATEMENT OF THE ISSUES

1. Whether individual legislators have Article III standing to sue state and federal executive officials for altering the manner of federal elections in conflict with the individual legislators' successful votes to regulate the manner of federal elections in Pennsylvania pursuant to Article I's Elections Clause and Article II's Electors Clause. App.29-30; 57-59.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

The District Court entered final judgment in *Keefer v. Biden*, No. 1:24-CV-00147, 2024 WL 1285538 (M.D. Pa. Mar. 26, 2024) on March 26, 2024.

Plaintiffs-Appellants petitioned the United States Supreme Court for Writ of Certiorari Before Judgment on April 23, 2024 with assigned case number 23-1162. On June 12, 2024, Plaintiffs-Appellants' petition was distributed for the conference of September 30, 2024.

## STATEMENT OF THE CASE

## I. Legislator-appellants have the individual opportunity and responsibility to vote to regulate the manner of federal elections in Pennsylvania.

Plaintiffs-Appellants (Legislator-Appellants) are twenty-seven state legislators of the Commonwealth of Pennsylvania. App.33 ¶¶ 7-10. As 27 of the 253 real persons who make up the legislative branch of the Commonwealth's government, *id.*, they have specific duties under the U.S. Constitution to appoint Electors, who, in turn, elect the President and Vice President under Article II's "Electors Clause," and to regulate the times, places, and manner of federal elections under Article I's Elections Clause. App.36-37 ¶¶30–41. The Legislator-Appellants each took an oath to support, obey, and defend the Constitution of the United States and the Constitution of the Commonwealth. *E.g.*, App.321 (Decl. of Representative Charity Grimm Krupa, ¶ 5).

Under the State's Constitution, the Commonwealth of Pennsylvania has three branches of government, the Executive, Legislative, and Judicial. Pa. Const. arts. II–V. The Legislative Branch—also known as the General Assembly—is composed of the House of Representatives and the Senate, and has the sole legislative power to pass laws. Pa. Const. arts. II §1, III. § 1. As members of the state House and Senate, individual legislators have the opportunity to vote yea or nay regarding proposed laws (bills). Pa. Const. art. III § 4.

## II. Pennsylvania legislators successfully voted for legislation prohibiting third-party involvement in elections.

A Pennsylvania law enacted after the 2020 election (App.113-16, Senate Bill 982 [SB982], 2022 Pa. Legis. Serv. Act 2022-88, now at 25 Pa. Stat. § 2607) prohibits the use of private resources for voter registration or for preparation or administration of conducting elections in the Commonwealth. App.40-41, 113-16. For example, Legislator-Appellant Representative Joseph Hamm, successfully voted to have SB982 enacted. App.316-18 (Declaration of Joseph Hamm). The law specifically states that any election costs incurred "shall be funded only upon lawful appropriation of the Federal, State and local governments, and the source of funding shall be limited to money derived from taxes, fees and other sources of public revenue." App.41, 113; Pa. St. 25 P.S. § 2607.

The law does not authorize the type of election activities called for by President Biden's EO14019. In contrast, through EO14019, President Biden and his political appointees, including the named federal appellees as federal department heads, issued directives to solicit for, and facilitate use of private, non-governmental third-party resources for voter registration services. App.34-35, 117-121.

Pennsylvania Statute, 25 P.S. § 2607, originally known as SB982, became law on July 11, 2022. The underlying policy rationale for the law's enactment was the need to prevent public officials from partnering with third party non-governmental organizations "for the registration of voters or the preparation, administration or

conducting of an election in this Commonwealth." 25 P.S. § 2607(b). As one of the

chief authors of the law explained, the concern regarding outside support involved in

the election process required action to prevent potential undue influence in those

elections procedures or processes:

> No matter how well-intended, such outside support has the
> potential to unduly influence election procedures, policies, staffing,
> and purchasing, which in turn may unfairly alter election outcomes.
> Even more importantly, it stands to erode voter confidence in a
> pillar of our beloved democracy…The 2020 Presidential Election
> saw non-governmental entities contribute hundreds of millions of
> dollars…Further, it has been reported that this funding was only
> secretly vetted by certain high-ranking officials from the executive
> branch who identified which counties should be invited to apply.[1]

For over thirty years since Congress passed the federal National Voter

Registration Act, 52 U.S.C. § 20901 et seq., the Pennsylvania legislative branch has

had the opportunity to authorize federal agencies to perform voter registration, but

they have declined to do so. App.39-40 (25 Pa C.S.A. §1321).

### A. Biden's Executive Order 14019 solicits nongovernmental third-party involvement in the manner of elections—that is, the registration process.

In the aftermath of the 2020 Election, 28 states, including Pennsylvania,

enacted laws prohibiting the influence of third-party non-governmental organizations

---

[1] Memorandum from Senators Lisa Baker and Kristin Phillips-Hall to All Senate
Members (Oct.20, 2021) (available at https://www.legis.state.pa.us//cfdocs/Legis
/CSM/showMemoPublic.cfm?chamber=S&SPick=20210&cosponId=36370)

in election operations.[2] This was largely in response to the more than $400 million dollars in donations from the Chan Zuckerberg Initiative (a foundation) selectively distributed by what has been described as partisan third-party non-governmental organizations, such as the Center for Tech and Civic Life ("CTCL"). Recently, U.S. House of Representatives, Committee of House Administration Chairman Bryan Steil explained how private third-party involvement in election processes may sow public distrust in the election process:

> Publicly, CTCL said these funds were intended to support poll worker recruitment efforts or the purchase of new equipment. But in reality, some of these funds were used primarily for voter registration events and get-out-the-vote efforts in Democrat-leaning cities and counties.[3]

On March 7, 2021, President Biden issued Executive Order No. 14019 "Promoting Access to Voting" (EO14019) applying to all 50 states. App.117-21 (86 Fed. Reg. 13,623). EO14019 commanded the heads of the Appellee federal departments, sued in their official capacities, to develop plans to use the agencies to

---

[2] The 28 states are: Alabama, Arizona, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, West Virginia, and Wisconsin (state-legislature-approved constitutional amendment). *States Banning or Restricting "Zuck Bucks"*, Capital Rsrch. Ctr. https://capitalresearch.org/article/states-banning-zuck-bucks/ (last updated April 10, 2024).

[3] *American Confidence in Elections: Confronting Zuckerbucks, Private Funding of Election Administration: Hearing before the Committee on House Admin.*, 118 Cong. (2024) (opening remarks of Rep. Bryan Stiel), https://cha.house.gov/2024/2/chairman-steil-delivers-opening-remarks-at-zuckerbucks-hearing.

conduct get-out-the-vote activities and voter registration drives in partnership with Biden administration approved third-party non-governmental organizations. App.117-18 (Sec. 3(a)(iii)(C)), App.34-34 (¶¶ 13-24). There is no evidence Congress authorized the executive action nor appropriated funding for Executive agencies to engage in the election activities under the Executive Order. App.41-48 (¶¶ 67-108). Notably, Pennsylvania has also not appropriated funds to support EO14019. App.41 ¶ 65.

## B. State Secretaries of State, Attorneys General, and members of Congress asked Biden to rescind EO 14019 and explain its implementation.

Despite numerous requests from agencies and elected officials, the Biden Administration has neither rescinded EO14019, nor offered transparency regarding the Order's implementation.

In August 2022, 15 State Secretaries of State wrote to President Biden requesting that EO14019 be rescinded.[4] The Secretaries expressed concern that involving Federal agencies in the registration process "will produce duplicate registrations, confuse citizens, and complicate the jobs of our county clerks and election officials."[5] They explained that their respective state legislative branch is solely authorized to prescribe the way elections are run, and should alterations in the

---

[4] Joint Letter from Secretaries of State of Alabama, Arkansas, Florida, Georgia, Idaho, Indiana, Louisiana, Mississippi, Montana, Nebraska, Ohio, South Dakota, Tennessee, West Virginia, and Wyoming to President Joe Biden, (Aug. 3, 2022) (publicly available at https://sos.wyo.gov/Media/2022/Joint_SOS_Letter-Biden_EO_14019.pdf).
[5] *Id.*

election process be needed, that would be the province of the legislative branch of *their* state government and not the federal executive branch.[6] Finally, the Secretaries warned that "[i]f implemented, [EO14019] would also erode the responsibility and duties of the state legislatures to their constitutional duty within the Election Clause."[7]

Likewise, in September 2022, 13 State Attorneys General wrote a letter to President Biden asking him to rescind EO14019 explaining their view that the Executive Order as unconstitutional and potentially designed to benefit the President's own political party.[8]

Then again, in October 2022, nine members of the U.S. House of Representatives sent a letter to the U.S. Attorney General asking him to turn over the strategic plans for the Department of Justice's implementation of EO14019.[9]

In May 2023, 14 U.S. Senators sent a letter to President Biden complaining about the secrecy of EO14019 agency plans and partisan motives and tactics.[10] No

---

[6] *Id.*

[7] *Id.*

[8] Multistate Letter from Attorneys General of Louisiana, Alabama, Arizona, Arkansas, Montana, Nebraska, Oklahoma, Indiana, Kentucky, Mississippi, South Carolina, Texas, and Utah to Joseph R. Biden, Jr., President of the United States (Sept. 28, 2022) (publicly available at https://attorneygeneral.utah.gov/wp-content/uploads/2022/09/EO-14019-Multistate-letter-FINAL.pdf).

[9] Letter from Congress Members: Ralph Norman, Mary E. Miller, Bill Posey, Louis Gohmert, Ben Cline, Randy K. Weber, Fred Keller, Chip Roy, and Andy Briggs to Merrick Garland, Attorney General of the United States (Oct. 18, 2022) (publicly available at https://norman.house.gov/uploadedfiles/letter-to-ag-garland-re-eo-14019-final.pdf).

[10] Letter from Senators Bill Hagerty, Mitch McConnell, Deb Fischer, Ted Budd, Rick Scott, Mike Braun, Mike Lee, Cindy Hyde-Smith, Shelley Moore Capito, Roger F.

evidence of any response was received. In that light, months later, in November 2023, 23 U.S. Senators sent another letter to President Biden reminding him: (1) the Executive Order directed federal agencies to engage in voter activities without Congressional approval; (2) using funds for the Order objectives not intended for such use by Congress is a violation of law; and (3) that the White House is avoiding Congressional oversight as the Executive election plans remained undisclosed despite repeated requests:

> Executive Order 14019 directs more than 600 federal agencies to engage in voter-related activities without congressional approval…[u]sing appropriated funds for a purpose that Congress did not expressly authorize would constitute a violation of [law]…Unfortunately, the White House has kept these plans hidden despite numerous requests from Congress.[11]

Recognizing that EO14019 would not be rescinded and after the repeated refusal to disclose the scope of agency plans or the identity of the "approved" third-party non-governmental organizations, the Appellant-Legislators were forced to take action. *E.g.*, App.60. In January 2024, the Legislators commenced a federal action in

---

Wicker, James Lankford, Ted Cruz, Ron Johnson, and Katie Boyd Britt to President Joseph R. Biden, Jr. (May 10, 2023) (publicly available at https://www.lankford. senate.gov/wp-content/uploads/media/doc/lankford_hagerty_letter_on-eo-14019.pdf).

[11] Letter from Senators Bill Hagerty, Mitch McConnell, Deb Fischer, Cynthia Lummis, Ron Johnson, Ted Budd, Shelley Moore Capito, Ted Cruz, Katie Boyd Britt, Roger F. Wicker, Mike Lee, Mike Braun, Rick Scott, JD Vance, James Lankford, Bill Cassidy, Roger Marshall, Tom Cotton, Kevin Cramer, Cindy Hyde-Smith, Jim Risch, Steve Daines, and Mike Crapo to President Joseph R. Biden, Jr. (Nov. 28, 2023) (publicly available at https://www.hagerty.senate.gov/wp-content/uploads/2023/11/FINAL-EO-14019-Letter-to-POTUS.pdf).

the U.S. District Court for the Middle District of Pennsylvania seeking to enjoin the unlawful overreach of the federal and state executive branches. App.31-69 (Amended Complaint); App.70-263 (Complaint Exhibits).

### III. Pennsylvania Governor Shapiro changed the manner of federal elections by unilaterally proclaiming automatic voter registration that is contrary to the state's election law.

On September 19, 2023, Governor Shapiro proclaimed through a press release that Pennsylvania had implemented Automatic Voter Registration (AVR). App.48-49 (¶¶ 109-111); App.111-12. However, AVR is not part of Pennsylvania's election code. App.53. While Pennsylvania's election code provides for individual voter registration, it does so without mentioning automatic voter registration. 25 Pa.C.S.A. § 1321 (2002).

In recent legislative sessions, bills were introduced that would have made AVR legal. App.52, 79 (Memorandum regarding reintroducing proposed AVR legislation); App.80-110 (SB40 of 2023, Proposed AVR Amendment to Pennsylvania Election Code). However, every AVR bill introduced was defeated in the legislative law-making process reflecting the intent of legislators, not to support AVR, including the Appellant-Legislators. App.52-53 (¶¶ 132-33).

Despite the lack of legislator support to legalize AVR, Governor Shapiro took executive action to legalize automatic voter registration contrary to existing law, and specifically, contrary to the individual legislators who successfully defeated AVR bills. App.52-53.

**IV. Pennsylvania executive officials changed the manner of federal elections through directives that contradict legislation.**

The U.S. Congress and the Pennsylvania legislature have enacted laws regarding verification of identity and eligibility of applicants for voter registration, in portions of the "Help America Vote Act" (HAVA) at 52 U.S.C. § 21083 and 25 Pa.C.S.A. § 1328(a) and (b), respectively. Meanwhile, the Pennsylvania Department of State has issued directives "Directive Concerning HAVA-Matching Drivers' Licenses or Social Security Numbers For Voter Registration Applications." App.53, 73. This directive instructs counties to register applicants even if an applicant provides invalid identification on their voter registration application. App.53-57, 73.

The Legislator-Appellants' amended complaint alleged that the directive contradicts laws enacted by both Congress and Pennsylvania. App.53-55. (¶¶ 139-146). The amended complaint alleges that invalid driver's license numbers and invalid social security numbers on an application make it "incomplete" and "inconsistent;" conditions that existing election laws describe as reasons to reject an application. App.65-67. The amended complaint further claims that the directive also violates federal law, specifically HAVA's requirement to verify the identity of applicants for voter registration. App.66.

In 2005, the U.S. Election Assistance Commission issued guidance that States must give individuals who provided invalid or mismatched information "an

opportunity to correct the information at issue."[12] The guidance further stated that the opportunity to correct the information "does not mean that States should accept or add unverified registration applications to the statewide list." *Id.*

In 2020, Pennsylvania legislators, including several of the Legislator-Appellants, voted to amend 25 Pa. Stat. § 1328, but that 2020 amendment did not change or remove the language of the statute related to the reasons to reject incomplete and inconsistent voter registration applications.[13]

To stop the overreach of federal and state executive officials as it relates to the times, places, and manner of federal elections that is within the exclusive purview of the legislative branch, the Legislator-Appellants who specifically voted against such executive actions being taken commenced this federal lawsuit. App.31-69 (Amended Complaint). The amended complaint alleges that President Biden's EO14019, Pennsylvania Governor Shapiro's AVR edict, and the Pennsylvania Department of State's directive to counties not to verify the identification of voters, usurped or nullified the legislators' duties and rights related to Pennsylvania federal election laws. 25 Pa. Stat. § 2607, and 25 Pa.C.S.A. §§ 1321, 1328(a), (b), respectively. App.67-68.

---

[12] *Voluntary Guidance on Implementation of Statewide Voter Registration Lists*, U.S. Election Assistance Commission (July, 2005), https://www.eac.gov/sites/default/files/ eac_assets/1/1/Implementing%20Statewide%20Voter%20Registration%20Lists.pdf.
[13] House Roll Call: Details for House RCS No. 1139, Pa. House Reps. (Mar. 25, 2020) (available at https://www.legis.state.pa.us/CFDOCS/Legis/RC/Public /rc_view_action2.cfm?sess_yr=2019&sess_ind=0&rc_body=H&rc_nbr=1139).

In part because of the urgency to ensure the upcoming 2024 elections take place under lawful parameters, the Legislator-Appellants additionally filed a motion for preliminary injunction, seeking to enjoin the continued implementation of President Biden's, Governor Shapiro's, and the Pennsylvania Department of State's executive actions. *See id.* On March 26, 2024, the district court denied the Legislator-Appellants' motion and dismissed their amended complaint for lack of jurisdiction, specifically holding a lack of individual legislator standing. App.3 (Order), 4-30 (Memorandum). The lower court did not reach the merits on the remaining claims. *Id.*

## SUMMARY OF THE ARGUMENT

The 27 individual Pennsylvania state legislators ("Legislator-Appellants") have standing to sue federal and state executive officials for violations of the U.S. Constitution's Elections Clause and Electors Clause—a specific and unique designation of duty and authority to them to prescribe the times, places, and manner of federal elections. The district court erred by characterizing the Legislator-Appellants' injuries as merely institutional, foreclosing this lawsuit to enjoin rogue executive branch actions which usurp or nullify the Legislator-Appellants' votes on legislation regulating federal elections.

Pennsylvania governor Josh Shapiro had no lawful authority to implement Automatic Voter Registration (AVR) in 2023 when he proclaimed AVR as a method to register. While bills that could have authorized "automatic" voter registration were considered, these bills were out-right rejected in legislative committee votes in both 2021 and 2023. The Legislator-Appellants in both the state House and Senate successfully defeated those bills in committee. The Governor's lawless action both had the effect of amending the election laws governing registration and of nullifying the successful votes of Legislator-Appellants. The Legislator-Appellants' exercise of their unique constitutional authority to legislate the manner of federal elections was futile.

Meanwhile, the Commonwealth's Department of State (the "Department") only has legal authority to take actions that are necessary to ensure county election

commissions comply and participate with Pennsylvania's election code. But, when the Department promulgates directives that are inconsistent and contrary to election laws, individual legislator rights and duties are nullified. While the Help America Vote Act, (HAVA) at 52 U.S.C. § 21083, and Pennsylvania election code in 25 PaC.S.A. § 1328(a) and (b) outline the requirements for voter registration applicants, and provides for rejecting incomplete applications, the Department issued a "Directive Concerning HAVA-Matching Drivers' Licenses or Social Security Numbers For Voter Registration Applications," which directs commissions to register applicants, even if an applicant provides invalid identification on their voter registration application.

President Biden acted without Article II authority and without Congressional authorization when he issued Executive Order 14019 (EO14019) in 2021. President Biden's EO14019 directs heads of executive branch agencies to develop plans to use federal agencies to conduct get-out-the-vote activities and voter registration drives in partnership with Biden administration approved third-party non-governmental organizations. In 2022, Legislator-Appellants successfully voted to amend Pennsylvania law to forbid third-party involvement in voter registration in the state. With the times, places, and manner of federal elections being within the purview of state legislators' rights and duties, the conflict and nullification of their votes caused by these federal executive branch actions were immediate.

The district court's dismissal of the underlying amended complaint for lack of individual legislator standing is in error. The court failed to apply the standard for

individual legislator standing in instances of specific, unique constitutional violations of legislators' authority established in *Coleman v. Miller,* 307 U.S. 433 (1939). The district court, instead, dismissed individual arguments for standing, characterizing the claims as an institutional injury by relying on *Raines v. Byrd*, 521 U.S 811 (1997). But, *Raines* and its progeny, *e.g.*, *Yaw v. Delaware River Basin Commission*, 49 F.4th 302 (3rd Cir. 2022) (finding two senators claimed only an institutional injury lacked standing for their general ability to pass fracking legislation), are distinguishable from *Coleman*, and inapposite to Legislator-Appellants' claimed individual constitutional injuries.

Like other rights, individual Legislators-Appellants can be injured as members of the discrete class of beneficiaries provided with the constitutional right and duty to regulate the manner of federal elections. *Coleman* held that individual state legislators standing exists, concerning individual state legislators rights under the Article V constitutional amendment process, because state "senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes." 307 U.S. at 438. The U.S. Constitution gives the legislatures plenary legislative power, even if it can be constrained somewhat by a state constitution, *Moore v. Harper*, 600 U.S. 1, 28 (2023), and there is no authority for the President or the Governor to usurp those powers. Yet, federal and state executive actions have nullified the legislators' votes that were sufficient to enact or defeat specific state election laws—specifically SB40, 25 Pa. Stat. § 2607 (2022) and 25 Pa.C.S.A. §§ 1321, 1328(a), (b) (2002 and altered 2020).

# ARGUMENT

## Standard of Review

This Court reviews a district court's dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of standing *de novo*. *In re Horizon Healthcare Services, Inc. Data Breach Litigation*, 846 F.3d 625, 632 (3rd Cir. 2017). "In reviewing challenges to standing, we apply the same standard as review of a motion to dismiss under Rule 12(b)(6)…Consequently, we accept the Plaintiffs' well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the Plaintiffs' favor." *Id.* at 633 (internal citations omitted).

## I. Legislators have the exclusive authority to enact legislation regarding times, places, and manner of federal elections.

### A. Pennsylvania Governor Shapiro cannot "amend" state laws governing federal elections enacted by the legislature.

During recent Pennsylvania legislative sessions, attempts were made to enact laws to make automatic voter registration legal. App.52, 79 (Memorandum regarding reintroducing proposed AVR legislation); App.80-110 (SB40 of 2023, Proposed AVR Amendment to Pennsylvania Election Code). However, those efforts failed in committee. And, the Legislator-Appellants never amended the Election Code to legalize automatic voter registration. App.52-53 (¶¶ 132-33).

Instead of recognizing or accepting the failed attempt to legalize automatic voter registration, the Governor, through an executive proclamation, effectively amended existing law that directly affects the manner in which voter registration is to

occur in Pennsylvania. Automatic voter registration is not legal as an accepted manner for federal elections. To begin, there should be little doubt that the Governor has no authority to change or amend state law because that authority is exclusively that of the legislature:

> A governor lacks the authority to change or amend state law since such power falls exclusively to the legislative branch. Although the power to make rules and regulations carrying out the provisions of a statute is not an exclusively legislative power and is also administrative in nature, the discretion of a legislative body, because of its formal role as a formulator of public policy, is much broader than that of an administrative board. An administrative agency does not have any broad authority to make laws; it only possesses the power to adopt regulations carrying into effect the will of the legislature, and if an administrative rule exceeds the statutory authority established by the legislature, the agency has usurped the legislative function thereby violating the separation of powers.

16 C.J.S. Constitutional Law § 456 (citations omitted).

Article III, A, 1, of the Pennsylvania Constitution explicitly states the legislature has the exclusive authority regarding the passage of laws:

> No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose.

Article IV, § 2 of the Pennsylvania Constitution explicitly states how the Governor is to ensure the laws of the state are faithfully executed:

> The supreme executive power shall be vested in the Governor, who shall take care that the laws be faithfully executed….

Nowhere does the Pennsylvania Constitution provide the Governor the authority to alter, amend, or otherwise fail to ensure the laws of the State are faithfully

executed. Here, because the Governor proclaimed to provide for *automatic* voter registration, as a manner to register, where bills were not only considered but rejected — bills of which the Legislator-Appellants successfully rejected— the Governor exceeded his authority and usurped the votes of the Legislator-Appellants in this case governing the times, places, and manner of federal elections.

Certainly, this is not a situation in which the Governor attempted to create a set of executive rules with the benefit of legislative guidance, something akin to filling in the details of broad legislation that describes overall policies. The election laws specific to the situation *omitted* the word "automatic." And, the Governor made voter registration "automatic" anyway.

Moreover, the actions of the Governor were not those instituted because of a natural disaster or other emergency. Generally, a Proclamation has "the force of law." *See* 35 Pa.C.S. § 7301(b) ("[T]he Governor may issue, amend and rescind executive orders, proclamations, and regulations which shall have the force and effect of law."). Executive orders or an administrative regulation promulgated by an executive agency would have the "force of law" that affects individuals outside the executive branch to "implement existing constitutional or statutory law." *Markham v. Wolf*, 647 Pa. 642, 190 A.3d 1175, 1183 (2018) (citing *Shapp v. Butera*, 22 Pa.Cmmw. 229, 348 A.2d 910, 913 (1975)). But here, the Governor's actions do not implement an existing election law. "Automatic" is not in the law governing voter registrations. The omission of a

word in existing law means something and by the Governor's actions, he seeks to play mischief with the existing intent of the law.

The Governor's proclamation is not to construe, but to amend the election law, which is within the exclusive province of the legislative branch. *See*, *Com. v. Gouger*, 21 Pa. Super. 217 (Pa. Super. 1902). *See e.g.*, *In re Est. of Kerstetter,* 808 A.2d 344, 347 (Pa. Cmmw. 2002) citing *Vlasic Farms, Inc. v. Pennsylvania Labor Relations Board*, 734 A.2d 487 (Pa.Cmmw. 1999), *affirmed,* 565 Pa. 555, 777 A.2d 80 (2001). Notably, "[t]he law is well settled that a court has no power to insert a word into a statute if the legislature has failed to supply it." 808 A.2d at 347. Certainly, if courts cannot insert a word into an enacted state law the legislature omitted, the Governor, limited in his authority through the State Constitution, lacks that authority as well under the circumstances of this case.

Indeed, the legislative branch of government *sets* the times, places, and manner of federal elections (which covers the subject of voter registration), and it excluded *automatic* registration despite attempts to change existing election law. In *Smiley v. Holm,* 285 U.S. 355 (1932), the U.S. Supreme Court recognized that the authority of Congress to regulate voter registration procedures falls within the virtue of its power to control the "manner" of holding elections. The Court explained that the power to control the "times, places, and manner" necessarily included such election processes as registering to vote:

[A] complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.

*Id.* at 366.

Similarly, the same principle would apply to state legislative branches of government. "Manner" includes voter registration. In *Storer v. Brown*, 415 U.S. 724 (1974), the Supreme Court opined that states may regulate "the time, place, and manner of holding primary and general elections, [as well as] the registration and qualifications of voters, and the selection and qualification of candidates." *Storer*, 415 U.S. at 730. Here, Legislator-Appellants did not amend the law to implement AVR, and individual legislators acted against it in committee. The Governor simply did not have the constitutional authority—under the federal nor the state constitution—to change existing election law by issuance of the executive order or proclamation, nullifying the Legislator-Appellants' votes against automatic voter registration. App.52-53.

On September 19, 2023, Governor Shapiro proclaimed that Pennsylvania had implemented Automatic Voter Registration (AVR). App.48-49 (¶¶ 109-111); App.111-12. However, AVR had not been added to Pennsylvania's election code by legislative votes of the Commonwealth's legislators. App.53. Pennsylvania's election code, promulgated by the votes of individual Pennsylvania legislators, using their respective

federal authority under the Elections Clause or Electors Clause or both, and their state constitutional opportunity to vote to pass bills into laws, successfully passed a law articulating that individuals "may apply to register," *without* authorizing automatic voter registration. 25 Pa.C.S.A. § 1321 (2002).

In recent legislative sessions, Pennsylvania legislators (not including Legislator-Appellants) introduced bills that would have made AVR legal. App.52, 79 (Memorandum regarding reintroducing proposed AVR legislation); App.80-110 (SB40 of 2023, Proposed AVR Amendment to Pennsylvania Election Code). However, each AVR bill was defeated through the legislature's law-making process because there was no tally of the legislators' votes (including votes of Legislator-Appellants) to support AVR. App.52-53 (¶¶ 132-33).

Although AVR bills failed as legislators intended, Governor Shapiro's executive proclamation effectively amended existing election law governing federal elections. Simply, the Governor acted contrary to the will and intent of individual legislators who successfully voted in committee not to pass AVR bills. App.52-53.

## B. Pennsylvania Department of State executive officials cannot promulgate directives that "amend" state laws governing federal elections enacted by the legislature.

The Pennsylvania Department of State (Department) has limited enforcement authority under 25 Pa.C.S. § 1803(a):

> The department shall have the authority to take any actions, including the authority to audit the registration records of a

commission, which are necessary to ensure compliance and participation by the commissions.

The Department's executory authority is narrowly tailored to actions "which are necessary to ensure compliance." Any unnecessary action, or an action that exceeds ensuring compliance and participation with the law is not authorized under Pennsylvania law.

Pennsylvania election laws require the verification of the identity and eligibility of applicants for voter registration. State law, regarding the approval or rejection of voter registration applications, 25 Pa.C.S.A. § 1328(a) & (b), states:

> (a) Examination.—Upon receiving a voter registration application, a commissioner, clerk or registrar of a commission shall do all of the following:
> (1) Initial and date the receipt of the application.
> (2) Examine the application to determine all of the:
> (i) whether the application is complete.
> (ii) whether the applicant is a qualified elector.
> (b) Decision.—A commission shall do one of the following:
> (1) Record and forward a voter registration application to the proper commission if the commission finds during its examination under subsection (a) that the applicant does not reside within the commission's county but resides elsewhere in this Commonwealth.
> (2) Reject a voter registration application, indicate the rejection and the reasons for the rejection on the application and notify the applicant by first class nonforwardable mail, return postage guaranteed of the rejection and the reason if the commission finds during its examination under subsection (a) any of the following:
> (i) the application was not properly completed and after reasonable efforts by the commission to ascertain the necessary information, the application remains incomplete or inconsistent.
> (ii) The applicant is not a qualified elector. …

App.54-55. While 25 Pa.C.S.A. § 1328(b) requires commissions to reject voter registration applications that are incomplete or for unqualified applicants, Congress has also passed the "Help America Vote Act" (HAVA), which at 52 U.S.C. § 21083 also lists requirements for voter registration lists and identification. To help states implement HAVA's requirements, in 2005, the U.S. Election Assistance Commission issued guidance that States must give individuals who provided invalid or mismatched information "an opportunity to correct the information at issue."[14] The guidance further stated that the opportunity to correct the information "does not mean that States should accept or add unverified registration applications to the statewide list." *Id.* 25 Pa. C.S.A. § 1328(a) and (b) align with the Election Assistance Commission Guidance.

Yet, the Department has issued a "Directive Concerning HAVA-Matching Drivers' Licenses or Social Security Numbers For Voter Registration Applications," directing commissioners to register applicants, even if an applicant provides invalid identification on their voter registration application. App.73. The Department thereby exceeds its delegated authority and nullifies existing election law requirements of 25 Pa. C.S.A. § 1328(a) and (b). Invalid driver's license numbers and invalid social security numbers on an application make the application "incomplete" and

---

[14] *Voluntary Guidance on Implementation of Statewide Voter Registration Lists*, U.S. Election Assistance Commission (July, 2005), https://www.eac.gov/sites/default/files/ eac_assets/1/1/Implementing%20Statewide%20Voter%20Registration%20Lists.pdf.

"inconsistent," conditions that require the registration to be rejected. The Department's executive action circumvents the election law and effectively 'repeals' or 'amends' existing law. 25 Pa.C.S.A. § 1328(a) and (b).

In 2020, legislators, including several Legislator-Appellants, voted to amend § 1328, but declined to change language related to rejecting incomplete and inconsistent voter registration applications.[15] The Department of State's directive to register applicants even if an applicant provides invalid identification nullifies the intent of the Legislator-Appellants who voted in opposition to amending 25 Pa.C.S.A. § 1328 (a) and (b).

### C. President Biden cannot "amend" state election laws governing federal elections.

President Biden's March 7, 2021 Executive Order No. 14019 "Promoting Access to Voting" (EO14019) applies to all 50 states. EO14019 commands the political appointees who head federal agencies to develop plans to use federal agencies to conduct get-out-the-vote activities and voter registration drives in partnership with Biden administration approved third-party non-governmental organizations. While Presidential executive orders have the force of law, valid orders issue only pursuant to one of the President's sources of power—that is—Article II of the U.S. Constitution or by Congress's delegation. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

---

[15] See note 13, House Roll Call.

Article II of the U.S. Constitution does not grant the President authority over the times, places, or manner of federal elections. The closest mention of federal elections in Article II is the Electors Clause regarding the election of the President and Vice President, which directs: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors…" Moreover, Congress did not authorize EO14019 as a means to alter the conduct of federal elections, nor did Congress appropriate funding for executive agencies to engage in the election activities as directed by EO14019.

Further, the President has refused to rescind EO14019 despite requests from state Attorneys General, Secretaries of State, and members of Congress who recognized the questionable legality of the Order in the first instance. Equally frustrating is the lack of transparency to explain or identify the third-parties that executive officials are to partner with. Although that issue is not for this case, the federal executive branch's lack of transparency shows complete disregard and disrespect for the state legislators' authority and their role regulating federal elections.

The President's EO14019 regulates voter registration, which is encompassed within the "manner" of federal elections. Because the President has no authority under the U.S. Constitution to regulate the manner of elections, which is a power specifically allocated to the legislative branch of government, EO14019 is constitutionally invalid.

For Legislator-Appellants, EO14019 nullifies the votes of the individual legislators by usurping the law-making process that led to their successful state enactment of Act 88 of 2022 (25 Pa. Stat. § 2607). Introduced as Senate Bill 982 (SB982), it was enacted into law on July 11, 2022. When SB982 legislation was introduced, the sponsor's memorandum explained the need to prevent public officials from partnering with third party non-governmental organizations "for the registration of voters or the preparation, administration or conducting of an election in this Commonwealth." 25 Pa. Stat. § 2607(b). The memorandum explained:

> No matter how well-intended, such outside support has the potential to unduly influence election procedures, policies, staffing, and purchasing, which in turn may unfairly alter election outcomes. Even more importantly, it stands to erode voter confidence in a pillar of our beloved democracy…The 2020 Presidential Election saw non-governmental entities contribute hundreds of millions of dollars…Further, it has been reported that this funding was only secretly vetted by certain high-ranking officials from the executive branch who identified which counties should be invited to apply.[16]

The public policy against potential corrupt practices the Legislator-Appellants sought to prevent through their successful votes in the law-making process, paradoxically, are now being promoted by the President and his federal agencies under EO14019. The President's action, as an incumbent seeking re-election, is benefitting from the voter registration processes embedded within federal agencies

---

[16] Memorandum from Senators Lisa Baker and Kristin Phillips-Hall to All Senate Members (Oct.20, 2021) (available at https://www.legis.state.pa.us//cfdocs/ Legis/CSM/showMemoPublic.cfm?chamber=S&SPick=20210&cosponId=36370)

and connections with third-party entities. President Biden's executive action deprives the individual state legislators of their federal rights [under the Elections Clause or Electors Clause], which is, a legally cognizable injury under Article III under *Coleman.*

## II. Individual legislators have cognizable individual injuries when the executive branch unconstitutionally exceeds its authority that is contrary to legislator votes affecting state federal election laws.

The federal judiciary has the authority to enjoin unlawful executive actions of both the federal and state Appellees as identified in the underlying Legislator-Appellants' amended complaint. The state courts of the Commonwealth of Pennsylvania would not have efficacious jurisdiction to stop unlawful actions of the federal defendants, but for over a century, the U.S. Supreme Court has recognized the ability to seek injunctive relief in federal court for violations of the Constitution. *Ex Parte Young*, 209 U.S. 123 (1908); *Trump v. Hawaii*, 138 S.Ct. 2392, 2407 (2018). Writing for the Court in *Armstrong v. Exceptional Child Ctr., Inc.*, Justice Scalia observed that "we have long held that federal courts may in some circumstances grant injunctive relief... with respect to violations of federal law by state officials, but also with respect to violations of federal law by federal officials." 575 U.S. 320, 326 (2015) (internal citations omitted). The authority of courts to "enjoin unconstitutional actions by state and federal officers" is a longstanding judicial remedy derived from a court's inherent equity powers. *Id.* at 327.

In addition to equitable relief, the Legislator-Appellants' amended complaint sought redressable relief under the Administrative Procedures Act (APA). App.62-64

(Counts II and III). Under 5 U.S.C. § 706, APA claims can be based on agency actions that are "contrary to constitutional right, power, privilege, or immunity." Here, the state Legislators-Appellants claim their federal constitutional rights under the Elections or the Electors Clauses were deprived or usurped by EO14019.

However, the issue presented here on appeal is standing. Generally, a plaintiff must establish three elements to have standing in federal court: (1) an injury in-fact which is "(a) concrete and particularized;" and "(b) actual or imminent, not 'conjectural or hypothetical;'" (2) a causal connection between the injury and the conduct complained of; and (3) the injury must be redressable by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations omitted).

In this case, when a legislator votes against the ratification of a law are overridden and virtually held for naught due to an act of the executive branch regarding federal election laws, individual legislators have "a plain, direct and adequate interest in maintaining the effectiveness of their votes." *See, Coleman v. Miller,* 307 U.S. 433 (1939). Under such circumstances, individual legislators have standing to sue in federal court. *Id.*

To address the injury element at issue in this part, section A, *infra*, distinguishes between categories of cases addressing legislator standing and demonstrates the circumstances of Legislator-Appellants align with the *Coleman* standard for nullification of legislator votes in an area where the U.S. Constitution has specifically

conveyed a unique right to legislators. The role, duties, votes, and powers of individual legislators that are injured by executive overreach are discussed in section B. Section C examines the alleged injury through the lens of § 1983-enforceable rights. Finally, section D explains how the individual Legislator-Appellants have sustained an injury that is different from others in the General Assembly.

### A. *Coleman v. Miller* provides the applicable "vote nullification" precedent test for finding the individual Legislator-Appellants have standing.

The Supreme Court has recognized individual legislator standing, under Article V of the U.S. Constitution, for state legislative ratification of federal constitutional amendments. *Coleman v. Miller,* 307 U.S. 433 (1939), distinguished in *Arizona State Legislature v. Arizona Independent Redistricting Comm.*, 576 U.S. 787, 803 (2015) (finding standing for the entire Arizona State legislature as a whole), and *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 668 (2019) (holding no standing in circumstances where the Virginia house continued alone without the state senate). The same *Coleman* principle is applicable in this case under the described circumstances relating to state election laws governing federal elections.

In *Coleman*, twenty Kansas state senators challenged the state legislature's ratification of a proposed amendment to the U.S. Constitution. The state senate had deadlocked on the amendment by a vote, and the lieutenant governor cast a tie-breaking vote in favor of ratification. *Id.* at 436. The claim of the objecting state legislators rested on the argument that the lieutenant governor did not have the power

to break the tie in relation to proposed Article V federal constitutional amendments.

*Id.* at 436. The Supreme Court held that the legislators had a plain, direct and adequate interest in the effectiveness of their votes as a right and privilege under the U.S. Constitution:

> Here, the plaintiffs include twenty senators, whose votes against ratification have been overridden and virtually held for naught…We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes. Petitioners come directly within the provisions of the statute governing our appellate jurisdiction. They have set up and claimed a right and privilege under the Constitution of the United States to have their votes given effect.

*Id.* at 438. *Coleman* has been distinguished, but not overturned, and similar to this case, deals with constitutionally-delegated powers. For example, when the Pennsylvania Governor uses his so-called "executive powers" to effectively amend existing election law to allow for automatic voter registration, and when legislators, including some of the Legislator-Appellants, successfully defeated bills in committee amending election laws to authorize automatic registration, the individual effectiveness of their committee votes have been nullified. Here, the Legislator-Appellants have a plain, direct and adequate interest in maintaining the effectiveness of their votes. *See e.g., id.*

The same is true regarding President Biden's EO14019. As previously demonstrated, EO14019 is contrary to state election laws that have rejected third-party entity involvement in the election process for federal elections. The Appellant-

Legislators votes were nullified or usurped by the federal executive branch officials who have no authority to do so under the Elections Clause.

Generally, cases about individual state legislator standing fall into three general categories: "lost political battles, nullification of votes and usurpation of power." *Silver v. Pataki*, 755 N.E.2d 842, 847 (NY. Ct. App. 2001) (categorizing legislative standing case fact patterns). Indeed, there is no standing for individual legislators' lost political battles. But, standing may exist for the nullification or usurpation of legislator votes. *See, id.* (citing *Coleman*, 307 U.S. regarding vote nullification; *Dodak v. State Admin. Bd.,* 495 N.W.2d 539 (Mich. 1993) for an example of legislative usurpation; *Raines v. Byrd*, 521 U.S 811 (1997) for lost political battles.)

*Silver* involved a single New York Assembly member, after voting and winning the passage of a bill, sued to claim a veto had unconstitutionally nullified his vote. The New York appellate court, using the reasoning of *Coleman*, found he had standing to challenge nullification of his personal vote. *Silver*, 755 N.E.2d at 847–48.

The U.S. Court of Appeals for the Third Circuit has similarly recognized individual legislator standing when lawmakers seek to exercise unique powers vested only with state legislators. In *Dennis v. Luis*, 741 F.2d 628 (3d Cir. 1984), the Third Circuit concluded eight state lawmakers had standing in federal court to challenge the

usurpation of their legislative authority by an executive official when the Governor

flouted an enacted law:

> Thus, our problem involves determining the court's role when these separate, independent branches of government – the executive and the legislative – clash and cannot resolve their differences on their own political turfs. Should legislators be allowed to use the judicial process to force the executive branch to comply with "the law of the land?" Or, phrased differently, should legislators be able to use the court to implement a victory that was won in the legislative hall and ignored in the executive mansion?" …In short, this case concerns a flouting by the Governor of a law that has been in fact enacted. Consequently, we believe it appropriate for us to consider the case."

*Id.* at 632-34.

Individual legislator standing in *Dennis* was predicated on the "personal and

legally cognizable interest peculiar to the legislators," their "right to advise and

consent," regarding appointments of officers, which was "vested only in members of

the legislature" and was "sufficiently personal to constitute an injury in fact thus

satisfying the minimum constitutional requirements of standing." *Id.,* at 631. *Goode v.*

*City of Philadelphia*, 539 F.3d 311, 318-19 (3d Cir. 2008). In *Goode*, this Court

distinguished its denial of standing to city council members challenging their city

solicitor's ability to make a settlement agreement from findings of individual legislator

standing in *Dennis* and *Silver,* because City Council appellants did not claim that they

have been deprived of meaningful participation in the legislative process, or that they

have been unable to exercise their rights as legislators. *Id.* at 318–319).

Although not precentral to this Court, the Pennsylvania Supreme Court's rationale in *Fumo v. City of Philadelphia*, 972 A.2d 487, 502 (Pa. 2009) is helpful. In *Fumo,* the State Supreme Court recognized individual legislator standing when members of the General Assembly "aim to vindicate a power that only the General Assembly has" using language found in *Coleman,* regarding interests in maintaining the effectiveness of individual legislator authority and vote:

> We conclude that the state legislators have legislative standing…The state legislators seek redress for an alleged usurpation of their authority as members of the General Assembly; aim to vindicate a power that only the General Assembly allegedly has; and ask that the Court uphold their right as legislators to cast a vote…Thus, the claim reflects the state legislators' interest in maintaining the effectiveness of their legislative authority and their vote, and for this reason, falls within the realm of the type of claim that legislators, *qua* legislators….

*Fumo,* 972 A.2d at 502; *see id.* at 343, n.5 (acknowledging that state and federal standing may be different, but nevertheless helpful).

Similarly, the Legislator-Appellants claim that executive officials—both federal and state—are circumventing the legislative process, by unilaterally creating and amending election laws in Pennsylvania thus "'distorti[ng]…the process by which a bill becomes law' by nullifying a legislator's vote or depriving a legislator of an opportunity to vote – which is an injury in fact." *See Russell v. DeJongh, Jr.*, 491 F.3d 130, 135 (3d Cir. 2007) (discussing *Coleman* and *Dennis* and drawing a distinction between an official's disobedience of a law and the injury to the legislator from nullifying a legislator's vote) (internal citations omitted).

The *Coleman* Court recognized individual legislator standing when executives outside of the legislative branch attempted to insert themselves into the constitutionally-directed legislative realm, thereby circumventing the authority and duty granted to individual legislators. *Coleman*, 307 U.S. at 438. Likewise, the Third Circuit recognized individual legislator standing when suffering personal injury when rights vested "only in members of the legislature" have been usurped. *Dennis*, 741 F.2d at 632-34. The U.S. Constitution's Elections Clause specifically and uniquely vests and directs that state legislatures shall prescribe the manner of federal elections. Legislatures are defined under each state's constitution. And, here, the state constitution vests the authority to individual legislators to vote on bills, including, as authorized under the Elections Clause, the times, places, and manner of federal elections. In short, under the constitutional vote nullification circumstances raised by Legislator-Appellants in this case, *Coleman* provides the appropriate legal precedent for standing.

1. **The district court's reliance on *Raines v. Byrd* is misplaced because the asserted injury was not inflicted by the state legislature itself, but by the actions of the executive branch of government.**

The district court decision's reliance on *Raines v. Byrd,* 521 U.S. 811 (1997) and *Yaw v. Delaware River Basin Comm'n*, 49 F.4th 302 (3d Cir. 2022) was misplaced. The facts presented by Legislator-Appellants here are aligned with *Coleman* and *Fumo* and not *Raines* nor *Yaw*. Moreover, the district court also disregarded Third Circuit

decisions recognizing individual legislator standing. By every measure from the persuasive *Fumo* decision and precedential *Dennis*, and *Coleman*, the Legislator-Appellants have federal court standing to prevent nullification and usurpation of their legislative authority to regulate the manner of elections in Pennsylvania.

In *Raines*, six disgruntled members of Congress who had voted against the Line Item Veto Act, which was enacted and signed into law, filed suit seeking a declaratory judgment that the Act was unconstitutional. *Raines,* 521 U.S. at 814–17. In denying standing, the Supreme Court noted that the plaintiffs' asserted injury to their legislative power was, in a real sense, inflicted by Congress upon itself. Indeed, the *Raines* plaintiffs had tried and failed to persuade Congress not to pass the Act. When Congress considered the Line Item Veto Act, the plaintiffs' votes "were given full effect. [Plaintiffs] simply lost that vote." *Id.* at 824. In other words, their loss was a political one derived from losing the legislative vote as part of the legislative process, duly separated from other branches of government.

The *Raines* Court expressed doubts that individual legislators who had lost a legislative battle could ever establish standing to assert a resulting injury on behalf of either their chamber or Congress itself. In such a case, the Court stated, the plaintiffs' quarrel was with their colleagues in Congress and not with the executive branch. *Id.* at 830, n.11. The Court expressed a deep reluctance to let members who had lost a battle in the legislative process seek judicial intervention by invoking an injury to Congress as a whole. This difference of opinion between the plaintiffs and their respective

chambers was not speculative; the Senate, together with the House leadership had filed an amicus brief urging that the law be upheld. *See Id.* at 818, n. 2. Plaintiffs' allegations were, the Court held, insufficient to establish a judicially cognizable vote nullification injury of the type at issue in *Coleman*. *Id.* at 824.

The *Raines* Court suggested individual legislator standing can be established when individual legislators show vote nullification of the sort at issue in *Coleman*: that a specific legislative vote was "completely nullified" by executive action despite a legislator-plaintiff having cast a vote that was "sufficient to defeat (or enact)" the act. *Id.* at 823.

Similar to *Raines*, *Yaw v. Delaware River Basin Commission*, 49 F.4th 302 (3rd Cir. 2022) involved two senator plaintiffs, who among others, alleged the Delaware River Basin Commission's ban on fracking deprived them of their lawmaking authority to pass legislation that would allow fracking. This Court found those legislators alleged only an institutional injury. However, because *Yaw* involved deprivation of a general right to pass legislation, the injury alleged by the senator plaintiffs in *Yaw* is distinct from the Legislator-Appellants' alleged injury, which claims deprivation of a specific, explicit, and unique Article I Constitutional duty and right to regulate the manner of federal elections.

In this case, Legislator-Appellants' quarrel is not with their colleagues in the Commonwealth General Assembly as a result of a vote, but with the federal and state executive branches whose actions nullified their votes. Unlike *Raines*, this case does

not involve legislators who voted, "simply lost that vote," and then sought in court to have the law invalidated. Just as in *Coleman*, the legislators' votes have been overridden and held for naught through unlawful executive actions. Just as in *Coleman*, the Legislator-Appellants votes have been "stripped of their validity," and "denied [their] full validity in relation to the votes of their colleagues." *Id.* at 824 n. 7. And, just as in *Coleman,* Legislator-Appellants seek recovery based upon rights and privileges granted to them, and a duty charged to them through the U.S. Constitution. *Coleman*, 307 U.S. at 438.

The Legislator-Appellants have not lost a battle in the legislative process, but in fact, have succeeded in voting for and passing enacted legislation, as well as precluding undesired legislation in committee, as part of the legislative process. President Biden's EO14019, particularly, nullifies and strips the Legislator-Appellants' votes of their validity by purporting to regulate the manner of federal elections, when for example, the Legislator-Appellants have successfully voted to pass legislation prohibiting third-party involvement in Pennsylvania elections.

Likewise, Legislator-Appellants did not lose the battle to vote down proposed legislation that would have implemented automatic voter registration in Pennsylvania. Instead, their legislative actions in opposition to proposed bills, resulted in automatic voter registration bills, being defeated and never reaching the floor of the General Assembly. But, because of the executive branch governmental official acts, such as

Governor Shapiro's acts, the Appellant-Legislators' votes and actions were nullified and stripped of their validity.

Significantly, Legislator-Appellants did not enact new laws authorizing Commonwealth Department of State officials to promulgate directives contrary to existing Pennsylvania election code regarding the manner of federal elections.

*Raines* only contemplated the standing of members of Congress who lost a legislative vote to colleagues. *Raines* remained silent on standing of state legislators who prevailed in legislative votes, but whose votes were ignored or supplanted by executive action. Moreover, *Raines* and its progeny are silent on the preemptive effect of executive actions that constitutionally belong to the legislative branch of government.

2. ***Coleman*** **remains the law of the land even with regard to recent Supreme Court decisions such as** ***Virginia House of Delegates.***

The U.S. Supreme Court recently provided guidance on who can litigate on behalf of a state or institution in *Virginia House of Delegates*, in which the Court held, "Virginia, had it so chosen, could have authorized the House to litigate on the State's behalf, either generally or in a defined class of cases." *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 664 (2019). The *Virginia* decision descends from, but is also distinct from *Arizona State Legis. v. Arizona Indep. Redistricting Commn.*, 576 U.S. 787, 804 (2015). The Supreme Court in *Arizona* held that the entire legislature had standing to sue, using the logic of *Coleman* that granted individual legislator standing, to the entire

legislature because "the Arizona Constitution's ban on efforts to undermine the purposes of an initiative…. would "completely nullif[y]" any vote by the Legislature, now or "in the future…."

In *Virginia*, both houses of the bicameral legislature had started the lawsuit together, but the House proceeded to appeal on behalf of the state without its Senate partner in the legislative process, which negated its original standing basis. 587 U.S. at 665. Neither *Arizona*, nor *Virgina,* overruled or cabined *Coleman*, nor did either decision foreclose individual legislator standing.

## B. The district court's narrowed construction of the phrase "sufficient to defeat or enact" referenced in *Coleman* to only final legislative votes is misplaced.

The district court denied standing noting that "should the Pennsylvania General Assembly, as a whole, wish to challenge these executive actions as contrary to law and usurping its authority, the General Assembly may do so." (App.26). The court cited *Arizona State Legislature v. Arizona Independent Redistricting Comm.*, 576 U.S. 787, 792 (2015), in which the Arizona legislature was found to have standing to assert an institutional injury.

However, Legislator-Appellants here have raised circumstances much closer to those in *Coleman*, which does not require an "institutional" injury that would necessitate the entire General Assembly to challenge the objectionable executive actions. A key example comes from the *Silver* decision in the New York Court of Appeals, which in reviewing the holding of *Coleman*, explained that a specific number

of legislators is not a prerequisite for individual legislator standing, at least with regard to New York state law. Explaining their interpretation of *Coleman,* the New York Court of Appeals held that each individual legislator had standing to protect the effectiveness of his or her vote:

> Nor is a controlling bloc of legislators (a number sufficient to enact or defeat legislation)) a prerequisite to plaintiff's standing as a Member of the Assembly. The *Coleman* Court did not rely on the fact that all Senators casting votes against the amendment were plaintiffs in the action…we think the better reasoned view*** is that an individual legislator has standing to protect the effectiveness of his vote with or without the concurrence of other members of the majority…Moreover, plaintiff's injury in the nullification of his personal vote continues to exist whether or not other legislators who have suffered the same injury decide to join in the suit.

*Silver,* 755 N.E.2d at 848-49. This must be the proper interpretation because otherwise, by requiring a specific number of legislators, "a suit could be blocked by one legislator who chose, for whatever reason, not to join in the litigation. Such a result would place too high a bar on judicial resolution of constitutional claims." *Id.* at 854, n.7.

Moreover, the legislative process has multiple stages that produce different answers to the question of how many legislators would be "sufficient to defeat (or enact) a specific legislative Act." Only one individual legislator is required to introduce a bill. Once introduced, the individual legislator's bill is sent to an appropriate committee. Typically, in Pennsylvania, proposed legislation regarding the manner of

elections is sent to the State Government Committees in both the House[17] and the Senate.[18] In the committee, one legislator, the Chairman, can defeat the bill by simply refusing to bring it to a vote in the committee. When a Committee votes on a bill, only 4 or 5 individual legislators create a majority "sufficient to defeat a specific legislative Act."

To construe *Coleman* so narrowly as to require "a controlling bloc" in just a final vote, ignores the complexity of the legislative process. Legislation can be defeated in various stages by a single legislator or a group of just four or five Pennsylvania legislators. Notably, the 27 Legislator-Appellants, serving individually on various committees are sufficient to enact or defeat legislation at some stages of the lawmaking process in the General Assembly.

The intent of the individual legislators manifested through their duty and opportunity to vote and enact a final legislative action, here 25 Pa. Stat. § 2607, was nullified though President Biden's EO14019 as the legislators were deprived of the intended legal effects of their successful vote on 25 Pa. Stat. § 2607—a legally cognizable injury under Article III per *Coleman*.

---

[17] General Operating Rules of the House of Representatives (2023-24) (available at https://www.house.state.pa.us/rules.cfm).
[18] Rules of the Senate of Pennsylvania, (2023-24), (available at https://www.pasen.gov/rules.cfm).

## C. The Elections Clause or the Electors Clause create § 1983-enforceable individual rights for Legislator-Appellants.

Another way to examine the alleged injury for individual legislator standing as asserted in the amended complaint, is to examine whether the Elections Clause, or Electors Clause, or both, create enforceable federal rights in favor of individual state legislators through a private cause of action under 42 U.S.C. § 1983. *City of Racho Palos Verdes v. Abrams*, 544 U.S. 113, 119–121(2005).

The U.S. Supreme Court requires an "unambiguously conferred right to support a cause of action brought under § 1983." *Id.* Courts consider three factors to determine whether such a right exists:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Colon-Marrero v. Velez*, 813 F.3d 1, 17 (1st Cir. 2016), quoting *Blessing v. Freestone*, 520 U.S. 329 (1997) (citations omitted). Here, the Legislator-Appellants contend that their asserted rights to regulate the times, places, and manner of federal elections and any violation of that right, is not vague. The right arises from both the Elections Clause of Article I and Electors Clause of Article II because the constitutional provisions use mandatory language directing that the legislature "shall" perform its constitutional

duties. But, the first factor raises the question of whether the rights provided under Article I and Article II were to benefit individual legislators.

Applying the first factor—the intent to benefit the plaintiffs—requires showing Legislator-Appellants belong to the intended class of beneficiaries of the law. *Rancho Palos Verdes,* 544 U.S. at 120; *see also, Gonzaga Univ.* 536 U.S. 273, 281 (2002) (discussing the need for individuals to assert the violation of a federal right). The Elections Clause and Electors Clause fit comfortably among federal legal provisions found to create individually enforceable rights because of their "'unmistakable focus on the benefited class.'" *Colon-Marrero,* 813 F.3d at 17, quoting *Gonzaga Uvir.* 536 U.S. at 28.

The Elections Clause text specifies the "Legislature" as a discrete class of beneficiaries and provides to them a specific power of regulating federal elections to them: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const, art. I § 4. As previously mentioned, a state "Legislature" is defined by the state's constitution. Within the Pennsylvania Constitution, it is the individual state legislator who exercises a "vote" unique unto them—not otherwise granted to any other person in the State who is not elected to the legislature. From that, it is the individual legislator who determines, by the authority granted to him or her, through the Elections Clause, to determine the manner of federal elections within the state. In

other words, the constitutionally-created rights are the individual state legislators' federal rights to prescribe the manner of federal elections.

Pennsylvania's Constitution describes the General Assembly as an entity with particular legislative authority made up of "Members" who "shall be chosen at the general election." Pa. Const. art. II, § 2. The real persons who make up the entity are the individuals elected as state legislators. Historically, "the relevant citizens" for jurisdictional purposes in a suit involving a "mere legal entity" were that entity's "members," or the "real persons who come into court." *Americold Realty Tr. v. Conagra Foods, Inc.*, 577 U.S. 378, 381 (2016) (citations omitted). Here, the legislators as individuals, are the real persons who come into court.

Similarly, the Electors Clause authorizes the state legislators to act, also creating federal rights for state legislators: "Each State shall appoint, in such Manner as the Legislature thereof may direct…" U.S. Const. art. II, § 1, cl. 2. Again, within the Pennsylvania Constitution, which defines the state "Legislature," it is the individual state legislator who exercises a "vote" unique unto them—not otherwise granted to any other person in the State who is not elected to the legislature. From that, it is the individual legislator who determines, by the authority granted to him or her, through the Electors Clause, to determine the manner of how electors are chosen within the state. "This Court has described that clause as 'conveying the broadest power of determination' over who becomes an elector. *McPherson v. Blacker*, 146 U.S. 1,

27(1892). And the power to appoint an elector (in any manner) includes power to condition the appointment[.]) See *Chiafalo v. Washington*, 591 U.S. 578, 589 (2020).

So, the Elections Clause and the Electors Clause specify the same discrete class of beneficiaries—those who, by the state constitution put in effect the Election and Elector Clauses, the state legislators—and commands the legislators to prescribe the manner of federal elections and the method of appointment of presidential electors. In *Moore v. Harper*, 600 U.S. 1 (2023), the U.S. Supreme Court clarified that whenever the state legislature carries out its constitutional power, it is acting as the "entity assigned particular authority by the Federal Constitution." *Id.* at 27. Another way to look at it is, without individual state legislators under the state constitution, there is no "legislature."

Legislator-Appellants suffer individual injuries under § 1983 because similar to constitutional rights extended to corporations, the purpose of the right is to protect the individual people. Legislator-Appellants alleged that they suffered individual injuries because like constitutional rights extended to corporations, the purpose of a constitutional right is to protect the rights of the individual people. While acknowledging Legislator-Appellants made this argument, the district court did not address it. App.15. The "usual demands of Article III, requir[e] a real controversy with real impact on real persons to make a federal case out of it." *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 34 (2019). Similar to the rights extended to corporations, characterized as protecting the rights of the people of those corporations, the

Legislator-Appellants have individual rights under the Elections Clause, and have each suffered a personal injury because they have been denied rights and privileges secured by the U.S. Constitution. "When rights, whether constitutional or statutory, are extended to corporations, the purpose is to protect the rights of these people." *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 706–07 (2014). So, at a conceptual level, the Legislator-Appellants have been individually injured by the executives' constitutional violations of the rights of the "legislature," which protects the legislators.

1. **Legislator-Appellants suffer individual injuries because under provisions of the U.S. Constitution, § 1983-enforcable rights are for the individuals, even when groups are named.**

Similar to constitutionally-described entities that have secured constitutional "right[s] of the people," such as the "Militia" mentioned in the Second Amendment, and the "Press" in the First Amendment, the Elections Clause's identification of "legislature" prescribes duties to and rights for individual legislators who are the real persons comprising the entity "legislature." For example, the Second Amendment identifies the Militia as an entity "comprised all males physically capable of acting in concert for the common defense." *D.C. v. Heller,* 554 U.S. 570, 580 (2008). But, individual people make up the militia. "[T]he "militia" in colonial America consisted of a subset of "the people"—those who were male, able bodied, and within a certain age range." *Id.* at 580. The individual members of the militia carried their guns just as

the individual members of the legislature cast their votes. An entity cannot bear arms—only the people who are members of the entity bear guns.

Similarly, there is no "press" without individuals who are writing and editing and publishing. The Press is also an entity comprised of individual people:

> The freedom of "the press" was widely understood to protect the publishing activities of individual editors and printers…Their activities were not stripped of First Amendment protection simply because they were carried out under the banner of an artificial legal entity. And the notion which follows from the dissent's view, that modern newspapers, since they are incorporated, have free-speech rights only at the sufferance of Congress, boggles the mind.

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 390 (2010).

Similar to a corporation, a "Militia," or "the Press," state legislators, including Legislator-Appellants, are a small, particular class of elected citizens who make up the entity, the legislature. Only 253 of Pennsylvania's 13 million citizens are members of the state legislature. The Elections and the Electors Clauses grant these 253 state legislators unique, constitutional rights to determine the times, places, and manner of elections.

As alleged in the amended complaint, the Pennsylvania Constitution vests the Elections Clause's legislative power in individual state legislators as part of their respective "senate" and "house" associations. App.38 (¶ 46). Therefore, under the Elections Clause and the Pennsylvania Constitution, the Pennsylvania state legislators, as part of two associations called the Senate and House of Representatives, shall vote

to enact laws, subject to the Governor's veto, to regulate the times, places, and manner of federal elections subject only to Congressional enactments.

Legislator-Appellants' amended complaint alleges that the Elections and Electors Clauses' references to "legislature" confer rights onto the individual state legislators. *E.g.*, App.38, 57-59. The Pennsylvania state legislature is not a state agency with a governor-appointed Commissioner and employees. Instead, the Pennsylvania state legislature consists of elected senators and representatives who organize their respective legislative bodies at the first meeting after the general election. In this way, the individual state legislators, with their newly-printed election certificates, precede and constitute the legislative body, as it is with any association. In fact, the legislative body would be nothing without the elected legislators.

## D. Legislator-Appellants suffered an injury different than other members of the Pennsylvania General Assembly.

By characterizing Legislator-Appellants' injuries as institutional and asserting the Legislator-Appellants have not "suffered an injury that is any different than any other member of the Pennsylvania General Assembly," App.25, the District Court ignores the disparate effect of the illegal executive actions taken. Indeed, those lawmakers who were not in favor of legislation passed by the Pennsylvania General Assembly have reaped the benefit of the nullification of those statutory regimes while the winning votes were overridden by executive fiat. In sum, those who voted for the

successfully-passed legislation, including Legislator-Appellants, have had their votes nullified.

Under the Elections Clause and Electors Clause, the references to the word "legislature" triggers federal court remedies for individual state legislators against federal executive and state executive usurpations of state legislative law-making under the Elections and Electors Clause. This case involves matters of exceptional importance as applied to a narrow category of cases involving implementation of state election laws.

### III. It is prudential to acknowledge Legislator-Appellants' standing to protect separation and balance of powers.

In *Moore v. Harper*, the Supreme Court held that when state legislatures enact laws governing federal elections, those laws are subject to state judicial review to ensure compliance with state constitutions, "[b]ut federal courts must not abandon their duty to exercise judicial review." *Moore*, 600 U.S. at 29-30.

In *Moore*, the U.S. Supreme Court stated that "the Elections Clause expressly vests power to carry out its provisions in "the Legislature"… a "deliberate choice that this Court must respect." *Moore*, 600 U.S. at 26-27.

> When legislatures make laws, they are bound by the provisions of the very documents that give them life. Thus, when a state legislature carries out its federal constitutional power to prescribe rules regulating federal elections it acts both as a lawmaking body created and bound by its state constitution, and as the entity assigned particular authority by the Federal Constitution. Both constitutions restrain the state legislature's exercise of power."

*Moore*, 600 U.S. at 4 (emphasis added). Per *Moore*, "[a] state legislature's "exercise of …

authority" under the Elections Clause…" must be in accordance with the method

which the State has prescribed for legislative enactments." *Moore*, 600 U.S. at 16.

(citations omitted).

Pennsylvania's Constitution, Art. II, Sec. 1, provides that the legislative power

is vested in the Senate and House of Representatives which are two associations of

elected legislators who enact laws. The executive branch has a limited role to play in

this process as the Governor has the opportunity to veto proposed legislation.

Article VII, Sec. 1 of the PA Constitution places the duty of passing laws

involving the registration Pennsylvania electors on the state legislators:

> Every citizen…possessing the following qualifications, shall be
> entitled to vote at all elections subject, however, to such laws
> requiring and regulating the registration of electors **as the General
> Assembly may enact**.

(Emphasis added).

The Supreme Court in *Moore* also articulated what is meant by "crafting" the

rules:

> By fulfilling their constitutional duty to craft the rules governing
> federal elections, state legislatures do not consent, ratify, or elect –
> they make laws. Elections are complex affairs, demanding rules that
> dictate everything from the date on which voters will go to the polls
> to the dimensions and font of individual ballots. Legislatures must
> "provide a complete code for congressional elections," **including
> regulations "relati[ng] to** notices, **registrations**, supervision of
> voting, protection of voters, prevention of fraud and corrupt
> practices, counting of votes, duties of inspectors and canvassers,
> and making and publication of election returns…"

*Moore*, 600 U.S. at 21-22. (citing *Smiley*, 285 U.S. at 366) (emphasis added).

By directing and effectuating their respective executive actions, each federal and state defendant has established, operated, and enforced non-legislated election policy. Correspondingly, each Legislator-Appellant has been denied the opportunity to exercise their constitutionally vested authority to cast their legislative vote on affirming or rejecting those new executive actions.

In summary, the amended complaint alleged that President Biden's EO14019, Pennsylvania Governor Shapiro's automatic voter registration edict and the Pennsylvania Department of State's directive to counties not to verify the identification of voters, usurp legislatively-enacted Pennsylvania state laws, 25 Pa. Stat. § 2607 and 25 Pa.C.S.A. §§ 1321, 1328(a) and (b), respectively. The separation and balance of powers essential to the framework of the Constitution has been jeopardized.

Mistakenly relying on *Raines* and *Yaw,* the District Court denied standing to Legislator-Appellants, thereby emboldening executive officials in a presidential election year, and depriving the lawmakers of their constitutional right and duty to regulate the manner of federal elections. Without this Court's intervention "officials who…lack the authority" to establish election law will continue to "chang[e] the rules in the middle of the game." *Republican Party of Pennsylvania*, 141 S.Ct. 732, 735 (2021) (Thomas, J., Dissenting from the Denial of Certiorari). As it is, with the district court

denying the preliminary injunction requested by Legislator-Appellants, the manner of the upcoming 2024 federal elections will occur under conditions that do not comport with the Elections Clause's delegation of duties and rights to the individual state legislators.

Under the facts alleged, *Coleman* provides the precedential avenue for this Court to find individual legislator standing exists because the subject executive actions nullified Legislator-Appellants' votes which were sufficient to enact or prevent specific state laws. As to whether "a controlling bloc of legislators (a number sufficient to enact or defeat legislation) [is] a prerequisite to plaintiff's standing as a Member of the Assembly," Legislator-Appellants' injuries in the nullification of their personal votes in this lawsuit continue to exist whether or not other legislators who suffered the same injury decide to join in this lawsuit. *Silver v. Pataki*, 755 N.E.2d at 848-49. Legislator-Appellants ask this Court to re-affirm individual state legislator standing in this case, consistent with *Coleman*, so they can continue adhering to their oath to uphold the Constitutions of the United States and of the Commonwealth of Pennsylvania.

## CONCLUSION

For the reasons stated, the 27 Pennsylvania Legislator-Appellants request this Court to reverse the district court's dismissal of the amended complaint and remand the case for further proceedings.

Respectfully submitted,

Dated: June 26, 2024

s/Erick G. Kaardal
Erick G. Kaardal, WI 1035141
Elizabeth A. Nielsen, PA 335131
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: (612) 341-1074
Email: kaardal@mklaw.com
Email: nielsen@mklaw.com

Karen T. DiSalvo, PA 80309
Mohrman, Kaardal & Erickson, PA
Election Research Institute
1451 Quentin Rd Ste 232
Lebanon, PA  17042
Email: kd@election-institute.com
*Attorneys for Appellants*

# CERTIFICATE OF COMPLIANCE

---

I certify that I am a current member of this Bar in good standing.

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

The brief contains 12,525 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii)

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14 point Garamond Font.

This brief has been scanned for viruses and malware and the best of my knowledge are free from viruses or malware.

I hereby certify that on June 26, 2024, I electronically filed the Appellants' Principal Brief, with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I hereby certify that the electronic version is identical to the paper copies.


Dated: June 26, 2024.                    s/Erick G. Kaardal
                                         Erick G. Kaardal, WI 1035141
                                         Elizabeth A. Nielsen, PA 335131
                                         Mohrman, Kaardal & Erickson, P.A.
                                         150 South Fifth Street, Suite 3100
                                         Minneapolis, Minnesota 55402
                                         Telephone: (612) 341-1074
                                         Email: kaardal@mklaw.com
                                         Email: nielsen@mklaw.com
                                         *Attorneys for Appellants*

## USE OF AI TECHNOLOGY CERTIFICATION

Counsel attests to the best of counsel's ability that appropriate steps to verify whether AI technology systems have been used in preparation of this submission, and if used, appropriate steps were taken to verify the truthfulness and accuracy of facts and citations of that content before submission to this Court. This submission did rely upon the ordinary or customary research tools and other available research sources such as, but not limited to, Westlaw or Lexis.

Dated: June 26, 2024

 s/Erick G. Kaardal
Erick G. Kaardal, WI 1035141
Elizabeth A. Nielsen, PA 335131
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: (612) 341-1074
Email: kaardal@mklaw.com
Email: nielsen@mklaw.com

Karen T. DiSalvo, PA 80309
Mohrman, Kaardal & Erickson, PA
Election Research Institute
1451 Quentin Rd Ste 232
Lebanon, PA  17042
Email: kd@election-institute.com
*Attorneys for Appellants*